UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | Crim. No. 06-101 |
| ) | |
| HAROL RODRIGO SUAREZ-GUARCIA ) | |
|     a/k/a "Jose Luis Herrera", ) | |
|     a/k/a "Chico, a/k/a "Dominick" ) | |
| ) | |

### GOVERNMENT'S MOTION TO DETAIN DEFENDANT PENDING TRIAL

**COMES NOW** the United States of America, by and through the undersigned attorney, and hereby moves to detain defendant Harol Rodrigo Suarez-Garcia (hereinafter "Suarez"), pending trial. In support thereof, the government states the following:

*Background*

Suarez was originally charged with federal narcotics offenses by complaint, filed on March 29, 2006. Pursuant to that complaint, a warrant for his arrest was issued on March 29, 2006 by order of the Honorable John M. Facciola, Magistrate Judge of the United States District Court for the District of Columbia. On April 4, 2006, Suarez was arrested in Panama based on a provisional arrest warrant for extradition.

On April 25, 2006, a federal grand jury sitting in the District of Columbia returned and filed a one-count indictment charging Suarez and four others with conspiracy to distribute five (5) kilograms or more of cocaine, intending or knowing that it would be unlawfully imported into the United States from the Republics of Colombia, Panama, Nicaragua, and elsewhere outside of the United States, in violation of Title 21, United States Code, Section 963; in conjunction with Title 21, United States Code, Sections 959(a)(1) and 960, and Title 18, United

States Code, Section 2. On April 25, 2006, a new warrant based on the indictment was issued by the Honorable Deborah A. Robinson, Magistrate Judge for the United States District Court for the District of Columbia. On January 11, 2007 Suarez was extradited from Panama to the United States.

From October 2004 to April 4, 2006, Suarez and the other charged defendants conspired to distribute hundreds of kilograms of cocaine, intending and knowing that the cocaine would be unlawfully imported into the United States. To accomplish their scheme, the defendants conspired to deliver quantities of cocaine to a Confidential Source (CS) in exchange for either weapons or cash.

The scheme was initially developed between the CS, based in Las Vegas, Nevada, and Suarez. During 2004-2005, the CS and Suarez communicated by phone over 70 times, and by email at least 20 times. Over 50 of these calls and emails dealing with the purchase of heroin and cocaine were intercepted. During these communications, Suarez advised that he and his associates, Colombian paramilitaries, were interested in exchanging heroin and cocaine for weapons, such as AK-47 rifles and C-4 explosives.

On June 21, 2005, the CS and Saurez met in Tegucigalpa, Honduras regarding the exchange of narcotics for weapons. The meeting was video and audio recorded.

On November 4, 2005, the CS met with Suarez and codefendant Estuardo Gonzalez in Managua, Nicaragua. The CS then took Suarez to view the weapons that he was interested in buying in exchange for narcotics. The weapons were provided by the Nicaraguan National Police (NNP). A Nicaraguan National Police (NNP) undercover officer (UC) and the CS showed the weapons to Suarez at a secret location. Suarez was shown a multitude of AK-47's, C-4's, M-79's M-60's, RPG's and ammunition, while the encounter was surreptitiously video and

audio recorded. Suarez is seen on videotape picking up and taking pictures and video footage of the weapons with a digital camera.

The next day, on November 5, 2005, the CS again met with Suarez and Gonzalez, this time in a video/audio-taped hotel room, to fine tune the details of the weapons deal. They agreed upon the following prices for the narcotics-weapons swap:

| | |
|---|---|
| 600 AK-47's | (150 kilos of cocaine or 75 kilos of heroin) |
| 10 M-60's | (10 kilos of cocaine or 5 kilos of heroin) |
| 15 M-79 | ( 30 kilos of cocaine or 15 kilos of heroin) |
| 50 kgs C-4 | ( 200 kilos of cocaine or 100 kilos of heroin) |
| 250 cases Ammunition AK-47 | (400 kilos of cocaine) |
| 6 RPG-7's | (12 kilos of cocaine or 6 kilos of heroin) |
| 40 RPG Rounds | (400 kilos cocaine or 200 kilos heroin) |

They also agreed that a $330,000 deposit would be paid to the CS on November 7, 2005, with the balance being paid upon delivery of the weapons on November 9, 2005. Although Suarez and Gonzalez seemed pressured to get the weapons back to Colombia, they never came up with the funds for the deposit. However, Suarez continued to stay in close contact with the CS in an effort to execute the narcotics for weapons deal.

On February 27, 2006, the defendant Castro entered the picture, when the DEA Cartagena Resident Office (CRO) and Colombian National Police (CNP) conducted surveillance of a meeting between the CS, Suarez, Castro and a fourth codefendant, Ceasar Ramirez. The meeting was audio-recorded. The purpose of the meeting was to introduce the CS to Castro and Ramirez, who were presented as members of the right-wing paramilitary organization "United Self Defense Forces of Colombia" (AUC), and to finalize the details of the weapons for narcotics transaction. Castro, who was introduced as the boss, stated that they were ready to do the deal, either in Colombia or Panama. Castro said he had a cocaine lab about 22 hours drive into the mountains from Bogotá that could produce about 350 kilos every 48 hours. The CS and his

3

associates would have to stay in Colombia for 15-20 days until the cocaine order was ready, at which time Castro would call his contact in the Colombian Navy to ensure the load could be taken out of the Colombian coast safely. Under that plan, the CS would bring the weapons by boat and the drugs would be exchanged for the weapons via boat on the high seas. Alternatively, Castro suggested the drugs could be handed over in Panama, where they had 2000 kilos ready.

However, the CS said he was still not ready to receive cocaine. He said he needed to do the deal in either Panama or Nicaragua in about two weeks. Ramirez asked the CS if he was interested in buying 25% more cocaine with cash, on top of that traded for the weapons. The CS agreed to buy the additional cocaine with cash, and said the transaction would be conducted in Panama in two to three weeks. Castro, Suarez and Ramirez agreed.

On March 20, 2006, the CS placed a consensually recorded telephone call and spoke with Castro. During the conversation, Castro and the CS discussed the costs of transporting cocaine from Colombia to Las Vegas, Nevada. Castro advised the CS that he would be giving the CS 200 kilograms of cocaine privately in Panama for the CS to sell in the United States, in addition to the cocaine being provided by his organization for the drugs for weapons deal.

The CS and Castro agreed that on March 29, 2006 Castro would be sending an associate to meet the CS in Managua, Nicaragua in to order to again verify the weapons that would be traded for cocaine in Panama. After that final showing of the weapons, the CS would then travel to Panama to meet on March 31, 2006 with Castro and other coconspirators, who the CS understood to be Suarez, Gonzalez, Ramirez and other unidentified associates, at which time he would be shown the cocaine to be traded for weapons. If the CS was satisfied with the drugs, Castro would give him the coordinates of a clandestine airstrip in Venezuela to deliver the

weapons by plane. Upon delivery of the weapons in Venezuela, the drugs would be turned over in Panama.

On March 21, 2006, the CS received a call from Castro. The CS recorded the call from Castro, who said he was making preparations for the upcoming meeting in Panama on March 31. Castro again stated he would be giving the CS an additional 200 kilograms of cocaine on credit for the CS to sell in the United States. The CS explained that the price of one kilogram of cocaine in Las Vegas is $16,800, while the price rises to $21,000 in the other areas of the United States that the CS transports drugs to. Castro said he understood.

Castro again stated his associate would verify the weapons in Managua on March 29, 2006. The CS advised Castro that he/she would have everything in place to conduct the transaction on March 31 in Panama, and Castro agreed. Castro said he would give the CS the location to send the weapons the following week.

On March 28, 2006, the CS received a telephone call in the United States from a man who identified himself only as "Santiago". Santiago, later identified as codefendant Carlos Ernesto Barreto-Sierra (hereinafter "Barreto"), advised the CS that he was calling on behalf of Suarez and was waiting in Managua, Nicaragua to meet with the CS to view the arms that the CS was to provide. The CS responded that he/she would arrive in Managua later that same day. Upon arriving in Managua later on March 28, 2006, the CS made a consensually recorded telephone call to Barreto and advised Barreto that they would meet the following morning to view the arms.

On March 29, 2006, the CS made a consensually recorded telephone call to Barreto in which the two arranged to meet to review the weapons in Managua. The CS met with Barreto while several DEA Agents performed surveillance. The CS and a Nicaraguan law enforcement

officer acting in an undercover capacity transported Barreto to an undercover location where they showed him a large cache of military-grade arms to include assault rifles, grenade launchers, and high powered rounds. Barreto inspected the weapons thoroughly and called Castro on the telephone to inform Castro that the weapons were acceptable and to continue with plans to deliver the CS approximately 900 kilograms of cocaine in Panama on March 31, 2006. The showing of the weapons was video-recorded. Barreto then informed the CS that he would be traveling to Panama on March 30, 2006 to be present for the cocaine delivery.

On March 31, 2006, the CS, in Panama, made a consensually recorded phone call to Suarez to discuss the upcoming deal. On March 31, 2006 and April 1, 2006, the CS and an undercover Panamanian law enforcement officer met with Castro, Suarez, and Barreto to discuss the transaction. When the parties were unable to reach final agreement as to the exact details of the transfer, the CS advised that Castro, Suarez, and Barreto could continue negotiating with the Panamanian undercover officer.

On April 4, 2006, Suarez and Castro contacted the Panamanian undercover officer and advised him that they would require a $1 million payment prior to delivering the cocaine, which was contrary to what was previously agreed. The CS called Suarez and Castro, who informed him/her that, due to the fact the CS was no longer in Panama, they would only feel comfortable transferring the drugs to the Panamanian undercover officer if the latter was able to provide the requested currency up front.

At that point a decision was made to arrest the defendants. On April 5, 2006, Castro, Suarez and Barreto were taken into custody by Panamanian government officials pursuant to a provisional arrest warrant for extradition.

*Argument*

A. *Statutory Presumption*

The presumption of detention under 18 U.S.C. §3142(e) applies in this case. Under 18 U.S.C. §3142(e), there is a statutory rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community if the judicial officer finds that there is probable cause to believe that the defendant committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act. An indictment charging a qualifying offense, as is the case here, is sufficient to trigger this presumption. United States v. Smith, 79 F.3d 1208 (D. C. Cir. 1996); United States v. Mosuro, 648 F. Supp. 316, 318 (D.D.C. 1986). When the presumption is triggered, it operates "at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." United States v. Alatishe, 768 F.2d 364, 371 (D. C. Cir. 1985). At the detention hearing, the government will proceed by proffer to establish additional facts relevant to the bail decision, as permitted by United States v. Smith, 79 F.3d at 1210.

B. *Nature and Circumstances of Offense Charged*

The offense charged involves an international drug conspiracy to distribute huge quantities of cocaine, with the ultimate goal of importation into the United States. Suarez and his coconspirators are aligned with the armed paramilitary organization "AUC", a U.S. State Department-declared foreign terrorist organization.

C. *Weight of the Evidence*

On April 25, 2006, after hearing a summary of the evidence in the case, a federal grand jury found probable cause to believe that Suarez had committed the charged offense.

*D. Safety of the Community*

The federal courts have recognized that drug traffickers, particularly those in positions of authority, are likely to continue engaging in drug related activities if released on bail and thus constitute a danger to the community. See United States v. Knight, 636 F.Supp. 1462 (S.D. Fla. 1986). Accord United States v. Creekmore, 1997 W.L. 732435 (D.D.C. 1997)(Facciola, J.).

Although the defendant's involvement in an international drug trafficking conspiracy is alone sufficient to warrant detention without bond, the potential danger to the community is aggravated in this case by the fact that the defendant is aligned with the AUC, a State Department-designated terrorist organization operating in Colombia, and the fact that military-grade weapons were allegedly to be exchanged for narcotics.

*E. Risk of Flight*

A determination of risk of flight must be supported by a preponderance of the evidence. United States v. Xulam, 84 F.3d 441, 442 (D. C. Cir. 1996). The Government submits that Suarez is a significant flight risk, and due to the seriousness of the crime charged, he would attempt to leave the U.S. if given the opportunity. On November 25, 2006, his co-defendant, Carlos Ernesto Barreto-Sierra, escaped from Panamanian custody to avoid being extradited to the United States.

There are compelling reasons to believe that the defendant would have the ability to flee this country if he were released on bond because of his numerous contacts in Central and South America. In the event that he were to abscond, it would be almost impossible to ever locate him again.

*F. History and Characteristics of the Defendant*

Suarez is a citizen of Colombia, and is a lawful permanent resident of the United States. Permanent residents who stay outside of the United States for more than a year can be considered to have abandoned their lawful permanent residency, and are eligible for an immigration charge which could result in the eventual loss of their lawful permanent residency. The government is unaware of any ties the defendant currently has in Washington, D.C. or anywhere in the United States. The National Crime Information Center (NCIC) database reveals prior arrests for battery, theft, and possession of a controlled substance, all in the 1990's.

**WHEREFORE**, for the foregoing reasons, the Government requests that the defendant be detained without bond pending trial.

Respectfully submitted,

_____
James A. Faulkner
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
(202) 616-8648

CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing Motion To Detain Defendant Pending Trial and Proposed Order of Detention was provided to defense counsel via ECF on January 16, 2008.

_____
James A. Faulkner